# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                        Civ. No. 02-1284  JP/LCS

SCOTT M. ACKLESON and SUE ANN ACKLESON,
and LARRY B. JETER and ROSETTA JETER,

       Defendants.

## MEMORANDUM OPINION AND ORDER

On November 27, 2002, Plaintiff filed its First Amended Complaint for Permanent Injunctive Relief (Doc. No. 8), which sought to enjoin Defendants from maintaining a locked gate across the road leading to Plaintiff's property. Plaintiff wants the gate removed so that some members of the public can, subject to certain restrictions, drive their vehicles to Plaintiff's land where they can hike and sightsee. On December 4, 2002, Plaintiff filed a Motion for Preliminary Injunction (Doc. No. 10). Plaintiff argued that it had a substantial likelihood of prevailing on the merits because (1) the easement recorded in Defendants' deeds permits members of the public to cross Defendants' land to visit Plaintiff's property for recreational purposes, and (2) the Unlawful Inclosures of Public Lands Act (UIA) prohibits Defendants from blocking the road to Plaintiff's property. Having considered the evidence and the relevant law, the Court concludes that Plaintiff's Motion for Preliminary Injunction should be granted.

FACTUAL BACKGROUND

For most of the past 120 years the Cox family owned land in Doña Ana County near the city of Las Cruces, New Mexico, including Soledad Canyon, located along the western foothills of the Organ Mountains.  When A.B. Cox died in 1975, his estate created the A.B. Cox Testamentary Trust (Cox Trust) to manage the family land.  During subsequent years the Cox Trust sold its land in Soledad Canyon, including the parcels involved in this action.

In 1993 the Cox Trust developed a subdivision called the Z-Ranch Estates in the lower, western part of Soledad Canyon.  Within the Z-Ranch Estates subdivision is a public road, named Soledad Canyon Road, which runs along an east-west route and is paved except for the last few hundred yards near the eastern end of the subdivision.  The Cox Trust dedicated the entire road within the Z-Ranch Estates to Doña Ana County, however, the County does not maintain Soledad Canyon Road past the end of the pavement.

Although the parties agree that the public can use Soledad Canyon Road up to the eastern boundary of the Z-Ranch Estates, they dispute the public's right to use the part of the dirt road that continues past the Z-Ranch Estates subdivision and across Defendants' property toward the base of the Organ Mountains, where Plaintiff's land is located.  Until 1995 this part of the road provided access to the remaining 433 acres of Cox Trust land in the eastern part of Soledad Canyon.  The Cox Trust maintained a gate at the east boundary of the Z-Ranch Estates subdivision to control access to the 433 acres.

In 1995 the Cox Trust sold Scott and Sue Ann Ackleson 10 acres of land bordering the eastern edge of the Z-Ranch Estates subdivision.  The 10 acres had been part of the 433 acre tract,

but is not part of the Z-Ranch Estates subdivision.  The Cox Trust conveyed the 10 acres of land in

a deed that describes the Acklesons' property as being

> subject to all easements and restrictions of record including a 60 foot wide road and
> utility easement southeasterly of and immediately adjacent to the northerly boundary
> and a 12 foot wide underground utility easement southeasterly of and immediately
> adjacent to said road easement.

Pl.'s Ex. 1 at 356.  The dirt road that is the easterly extension of Soledad Canyon Road runs

through the northern portion of the Acklesons' property and is within the 60-foot-wide road and

utility easement described in the deed.

In 1996 the Acklesons divided their 10 acres into two, five-acre lots and sold the western

portion that bordered the Z-Ranch Estates subdivision to Jeter Construction, Inc.[1]  The deed from

the Acklesons to Jeter Construction Inc. depicts an easement across the 10 acres in a plat that is

part of an exhibit attached to the deed.  The exhibit attached to the deed also contains a surveyor's

description of the western five-acres that used language very similar to that found in the

Acklesons' deed.  The Acklesons and Jeters constructed homes on their lots.

In 2000 the Cox Trust sold its remaining 423 acres in Soledad Canyon to the Nature

Conservancy.  During 2001 and 2002 the United States Bureau of Land Management (BLM)

obtained the 423 acres from the Nature Conservancy.  Pl.'s Exs. 2, 3.  Except for the western

boundary of the Jeters' property that borders the Z-Ranch Estates, Plaintiff's 423 acres surrounds

Defendants' properties on the north, east, and south.  Pl.'s Ex. 4a.  However, the dirt road through

Defendants' 10 acres provides the only means of access to the BLM's property by automobile.

---

[1]  Defendants Larry and Rosetta Jeter built their home on this property.  This Memorandum
Opinion and Order will refer to the western five acres as the Jeters' property.

3

Defendants supported the BLM's acquisition of the Soledad Canyon land, but they notified the BLM that the easement across the 10 acres could be used only by the BLM's representatives. Although Defendants do not mind Plaintiff using the 423 acres for a recreational area, they do not believe that Plaintiff's easement rights allow Plaintiff to invite members of the public to cross Defendants' land for that purpose. Defendants want the public to hike to Plaintiff's property from the contiguous Dripping Springs Natural Area, which the BLM also owns. To keep the public from using the road easement, Defendants constructed a gate across the dirt road leading to Plaintiff's property and locked it. The gate is located on the Jeters' property near its western boundary with the Z-Ranch Estates. On February 15, 2002, Defendants informed the BLM in writing that they considered the dirt road to be a private road "for BLM access only and is not intended for use by the general public." Defs.' Ex. O. Defendants provided the BLM with the combination to the lock on the gate so that its employees could use the road to reach the 423 acres.

## Legal Standard for a Preliminary Injunction

Before a district court can issue a preliminary injunction,

> the plaintiff must establish the following four factors: (1) a substantial likelihood of success on the merits of the case; (2) irreparable injury to the movant if the preliminary injunction is denied; (3) the threatened injury to the movant outweighs the injury to the other party under the preliminary injunction; and (4) the injunction is not adverse to the public interest. In addition, the right to relief must be clear and unequivocal because a preliminary injunction is an extraordinary remedy. This standard, which is difficult to meet under ordinary circumstances, is heightened when the requested preliminary injunction will change the status quo. In such cases, the movant has an even heavier burden of showing that the four factors listed above weigh heavily and compellingly in movant's favor before such an injunction can be issued.

*Salt Lake Tribune Pub. Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1099 (10th Cir. 2003)

(internal citations and quotations omitted).

4

**ANALYSIS**

> 1.     *A Substantial Likelihood of Success on the Merits Exists*

Plaintiff argues that the public can use the road through Defendants' land because the deed from the Cox Trust to the Acklesons included an express easement in the form of a public road. Defendants contend that the language used in the deed merely implies that an easement exists and is ambiguous at best, and thus, the extent of Plaintiff's right to use the road is fixed by past historical use. According to Defendants, past historical use shows that the "public has never been permitted unfettered access to Soledad Canyon by way of the [easement]." Doc. No. 20 at 32. Defendants argue that allowing members of the public to use the easement would transform the road into a public right of way which would (1) unreasonably increase the burden on Defendants' property, and (2) amount to a taking without compensation.

> A.     *The Deed Encumbered the Acklesons' Property with an Express Easement*

To determine how the road through Defendants' property may be used by Plaintiff, the Court must first determine whether the Cox Trust's deed to the Acklesons created an express easement or an implied easement. The distinction is critical because an express easement with no restrictions would allow "additional burdens which were contemplated or foreseeable at the time the easement was created," *Camino Sin Pasada Neighborhood Association v. Rockstroh*, 119 N.M. 212, 216, 889 P.2d 247, 251 (Ct. App. 1994), whereas Plaintiff's rights under a purely implied easement would be limited to prior use, Restatement (Third) of Property: Servitudes § 2.12 (2000) [hereinafter Restatement].

Defendants argue that Plaintiff has an implied easement across their property because (1) the easement language was only a surveyor's description of the property and was not included

within the body of the deed, (2) the language suggests that the easement described by the surveyor was "already a road and utility easement of record," Defs.' March 18, 2003 Letter Br. at 3, and (3) the language did not adequately describe all of the attributes of an easement.  Under New Mexico law, none of Defendants' arguments has merit.

Defendants correctly note that the easement language literally appears only in the surveyor's description of the property that was attached as Exhibit A to the Acklesons' deed.  Pl.'s Ex. 1 at 2.  However, Defendants ignore the language on the face of the deed that grants to the Acklesons land that is "more particularly described in Exhibit 'A' attached hereto and made a part hereof." *Id.* at 1.  According to Plaintiff's title expert, creating an easement in this manner is a common practice in New Mexico.  Tr. at 147 (March 10, 2003).  New Mexico case law supports that view.  *Brooks v. Tanner*, 101 N.M. 203, 206, 680 P.2d 343, 346 (1984) (using an exhibit to a real estate contract to interpret an easement and "give effect to the intentions of the parties"); S*haeffer v. Kelton*, 95 N.M. 182, 185, 619 P.2d 1226, 1229 (1980) ("The primary objective in construing a contract is not to label it with specific definitions or to look at form above substance, but to ascertain and enforce the intent of the parties as shown by the contents of the instrument.").  Given the explicit reference making Exhibit A part of the deed, the surveyor's description of the property was incorporated into the language of the deed itself.

Defendants also take issue with the surveyor's declaration, "[t]he above described tract is subject to all easements and restrictions of record *including* a 60 foot wide road and utility easement southeasterly and immediately adjacent to the northern boundary."  Pl.'s Ex. 1 at 356 (emphasis added).  Defendants argue that the language used by the surveyor suggests that the 60-foot-wide road and utility easement along the Acklesons' northern border was recorded before the

deed was signed.  Defs.' March 18, 2003 Letter Br. at 3; Tr. at 73 (March 10, 2003).  If that had

been the case, however, there would have been no need to describe this one particular easement in

detail[2] because it would have been included in the phrase "all easements and restrictions of

record."   When reviewing easement language New Mexico courts strive to avoid constructions that

render meaningless the phrases used by the parties.  *Camino Sin Pasada,* 119 N.M. at 215, 889

P.2d at 250; *Brooks*, 101 N.M. at 206, 680 P.2d at 346.  The most sensible way to construe the

word "including" in the disputed sentence is that the deed made the Acklesons' property subject to

all easements of record *in addition to* the easement described by the surveyor as lying within the

boundary of the property.  Webster's Third New International Dictionary 1143 (1968) (defining

"include" as meaning to "aggregate").  In other words the Acklesons' deed, which adopted the

surveyor's description of the conveyed property, subjected the Acklesons' 10 acres to a 60-foot-

wide road and utility easement for the first time.

Defendants contend that because so many aspects of this particular easement were not

defined, it should be considered an implied easement.  Defendants assert that the easement

language should have described "who is benefitted, who is burdened and what is the extent of the

allowable use."  Tr. at 66 (March 10, 2003).  Although more specificity may have been preferable,

under New Mexico law "[n]o particular words of grant are necessary to create an easement.  Any

words which clearly show intention to grant an easement are sufficient."  *Martinez v. Martinez*, 93

---

[2]   The surveyor referred to the easement throughout her description of the Acklesons' land.
For instance the western boundary of the 10 acres was described as ending at "an iron rod found on
the north boundary of a 60 foot wide road and utility easement known as Soledad Canyon Road."
Pl.'s Ex. 1 at 356.  From that point the boundary proceeded "along the north side of said road
easement to an iron rod set for the northeast corner. . . . [L]eaving the road easement" the eastern
property line then headed south.  *Id*.

N.M. 673, 675, 604 P.2d 366, 368 (1979).  Relying on *Martinez*, the New Mexico Court of

Appeals considered a deed with language strikingly similar to that employed here and held that an

express easement had been created.  *Camino Sin Pasada* 119 N.M. at 212, 889 P.2d at 248

(holding that the clause "subject to a forty (40) foot roadway and utility easement along the entire

North boundary" created an express easement).  New Mexico law has never required the specificity

that Defendants argue is needed to establish an express easement.  *Village of Wagon Mound v.*

*Mora Trust*, 2003-NMCA-035, ¶¶ 44, 51, __ N.M. __, 62 P.3d 1255 (dismissing the argument that

a conveyance must describe an easement "with particularity and if the conveyance fails to do so, it

is a nullity," since the "intent of the [parties] is undisputed"), *cert. denied*, __ N.M. __, 63 P.3d

516 (2003).

Defendants concede that the Acklesons and the Cox Trust intended to create the easement

across the Acklesons' land.  However, Defendants argue that the language used in the deed did not

expressly do so.  Doc. No. 52 at 3 n.2.  As part of that argument Defendants contend that the

surveyor's description of the easement reflected what the surveyor thought should be done or was

told to do to preserve access along the existing road.  Whatever the surveyor may have been

attempting to do is irrelevant since the deed shows that the Acklesons purchased from the Cox

Trust real estate that unambiguously included a 60 foot wide road and utility easement along its

northern border.  Even if ambiguities exist concerning precisely how the easement would be used,

from the deed it is clear that the Cox Trust and the Acklesons agreed that the Acklesons' property

would be encumbered with a 60 foot wide road and utility easement. Under New Mexico law, the

language employed in the Cox Trust's deed to the Acklesons was sufficient to establish an express easement.[3]

<strong>B.</strong>   <em>The Right of Way Across the Easement is Private, Not Public</em>

Plaintiff claims that it can invite members of the public across Defendants' land because the easement reserved by the Cox Trust was in the form of a public road.  In New Mexico, if "the grant or reservation is specific in its terms, it is, of course, decisive of the limits of the easement." *Kennedy v. Bond*, 80 N.M. 734, 736, 460 P.2d 809, 811 (1969) (quoting *Dyer v. Compere*, 41 N.M. 716, 73 P.2d 1356 (1937)).   Only if the terms of an easement are ambiguous should a court consider extrinsic evidence to determine the intent of the parties.  *Camino Sin Pasada*, 119 N.M. at 215, 889 P.2d at 250.

The Ackleson's deed merely describes the easement as a "road," without any modifier that would signal whether it is a public or a private right of way.  *Camino Sin Pasada* held that the unadorned term "roadway" was insufficient to create a public right of way.  119 N.M. at 216, 889 P.2d at 250.  That holding should apply with equal force to an easement simply described as a "road."  *Trigg v. Allemand*, 95 N.M. 128, 134, 619 P.2d 573, 579 (Ct. App. 1980) (observing that "[p]ublic ways, as applied to ways by land, are usually termed 'highways' or 'public roads'").

---

[3]  If easement language is ambiguous a court should look to extrinsic evidence to glean the parties' intent.  *Camino Sin Pasada*, 119 N.M. at 215, 889 P.2d at 250.  Here there is no need to resort to extrinsic evidence as *Camino Sin Pasada* resolved any ambiguity that may have existed with this kind of easement language.  Nonetheless, even considering extrinsic evidence the result would be the same.  Like the common grantor in *Camino Sin Pasada*, the trustee for the Cox Trust testified that the easement was necessary to keep open access to the Trust's land.  In addition, the Acklesons conveyed five acres to Jeter Construction Inc. using a deed that disclosed the same 60-foot-wide road and utility easement along the northern boundary of the property.  Defs. Ex. H.  As in *Camino Sin Pasada*, Defendants' recognition of the easement creates an inference that Defendants "believed an easement existed at the very place and with the very description claimed by the Plaintiff."  119 N.M. at 215, 889 P.2d at 250.

Whatever ambiguity can be said to exist in the term "road" after *Camino Sin Pasada*, the evidence presented has not persuaded the Court that the road easement should be construed as a public right of way. For many years before the Acklesons purchased their 10 acres, the Cox Trust maintained a locked gate, Pl.'s Ex. 5(a), just west of the Acklesons' land to keep the public from trespassing onto the Cox Trust land. Tr. at 205, 220 (Jan. 14, 2003). By 1995, when the Acklesons purchased their property, the circumstances indicated that the road was a private right of way.

> C.   *Permissible Use of the Easement Includes Access for Some Members of the Public*

The parties do not dispute that Plaintiff's 423 acres is the dominant estate that is benefitted by the easement or that the Defendants' 10 acres is the servient estate that is burdened with it. Nor do the parties dispute that the Cox Trust reserved the easement to provide vehicular access to the 423 acres. The quarrel here is focused on whether Plaintiff can invite the public to use the easement to access Plaintiff's land by motor vehicles.

Since the Cox Trust's deed to the Acklesons encumbered the Acklesons' property with an express easement, Defendants' argument that the use of the road should be limited to those uses associated with the Cox Trust's ranch as it existed in 1995 fails. The express easement in the Acklesons' deed did not place any limitations or restrictions on how the road was to be used.[4] Without specific language in the deed limiting Plaintiff's use of the easement, Plaintiff may use the

---

[4] The Acklesons were sophisticated and knowledgeable in real estate matters. Scott Ackleson is a past president of New Mexico Title Association and the owner of Doña Ana Title Company, where Sue Ann Ackleson works. If the Acklesons had desired to include limits on who could use the road or to curtail the activities for which the dominant estate could use the easement, they should have requested that the deed place such restrictions on the easement before closing their purchase of the 10-acre lot.

easement for any purpose that was "contemplated or foreseeable at the time the easement was

created." *Camino Sin Pasada*, 119 N.M. at 216, 889 P.2d at 251.

Sometimes a change in the use of an easement will unreasonably burden the servient estate.

In that situation the dominant estate must secure the servient owner's consent before the change in

use can be implemented. *Posey v. Dove*, 57 N.M. 200, 212, 257 P.2d 541, 548 (1953). However,

when a particular change in use of an easement was foreseeable, that use will neither unreasonably

burden the servient estate nor require the consent of the owner of the servient estate. *Camino Sin*

*Pasada*, 119 N.M. at 216, 889 P.2d at 251. More importantly, when reserving an easement the

owner of the dominant estate does not have to inform the owner of the servient estate that the

easement would be put to a particular use so long as that use was "reasonably foreseeable." *Id*.

Here, the size of the easement itself indicates that the parties expected that the use of the

easement as a road would increase dramatically in the future. A 60-foot-wide road and utility

easement abutting an additional 12-foot-wide easement for underground utilities suggests that

neither party expected the 423 acres to remain ranch land, but rather that the property would be

developed in some fashion. Obviously, that development would produce a marked escalation in

traffic using the road. *See* Restatement § 4.10 cmt. f, illus. 14 (noting that a 60-foot-wide

easement "suggests that substantial increase in use was contemplated by the parties").

Defendants counter that the large easement was necessary because some of the easement

lies within a deep arroyo that runs along the northern boundary of Defendants' land. Defendants

contend that to ensure a viable roadway the easement had to be extended 60 feet from the northern

boundary to compensate for the portion of the easement falling inside the arroyo. However, the

part of the easement lying within the arroyo is insignificant: the northwest corner of Defendants'

property lies at most 0.78 feet beyond the edge of the arroyo and the northeastern corner is not in

the arroyo at all.  Defs.' Ex. T at 3.  Defendants presented no other evidence that the northerly

boundary of their property extended a significant distance into the arroyo.

Even though the size of the easement indicates that the parties foresaw a substantial

increase of vehicular traffic using the easement to reach the 423 acres, the easement is silent with

regard to what uses would be made of that land.  In the absence of express limitations on how the

423 acres was to be used, extrinsic evidence should be considered to determine what reasonably

foreseeable use could be made of the 423 acres when the easement was established.  *Camino Sin*

*Pasada*, 119 N.M. at 216, 889 P.2d at 250.  The parties agree that it was foreseeable that a

subdivision may have been developed on Plaintiff's property.  Plaintiff claims that in addition to a

subdivision it was reasonably foreseeable that the BLM would purchase the land and use it for

recreational purposes.  Considerable evidence supports this view.

By 1995, when the Acklesons purchased their 10 acres, the Cox Estate had already sold the

adjacent property north of Plaintiff's 423 acres to the BLM.  That land encompassed the former

Cox Ranch headquarters, and the BLM used it to develop the Dripping Springs Natural Area,

which is a recreational site opened to the public.  Tr. at 43 (January 14, 2003); Pl.'s Ex. 14 (BLM

Organ Mountains Coordinated Resource Management Plan and Decision Record at 8, ¶¶ 7,8 (May

1989) [hereinafter 1989 Management Plan]).  In 1986, during county commissioners' meetings,

the Cox Trust publically declared its intention to convey its land in Soledad Canyon to the BLM.

Pl.'s Ex. 11.  That intention was shared by the BLM, which called the acquisition of the land

surrounding the Cox Ranch headquarters "a truly significant event" and placed a "[h]igh priority"

on acquiring the "remaining Cox family land."  1989 Management Plan at inside cover, 7.  Sara

Cox Hopkins, who is a trustee for the Cox Trust, testified that it was "common knowledge" that the Cox Trust had plans to either sell the 423 acres to the BLM, sell it to a large developer, or sell it to the Nature Conservancy.  Hopkins Aff. at 2; Tr. at 100 (Jan. 14, 2003).  Given this record, even if the Acklesons were not directly informed by the Cox Trust that the 423 acres would be ultimately purchased by the BLM for recreational use, that outcome was reasonably foreseeable. *Camino Sin Pasada*, 119 N.M. at 216, 889 P.2d at 251.  Because it was foreseeable that the easement would carry increased traffic and that the dominant estate could be converted to recreational use, Plaintiff's proposed use of the easement for its invitees will not unreasonably burden Defendant's servient estate.  As observed in the Restatement:

> Conflicts between the dominant and servient owners often arise when use of the dominant estate is changed.  If the change in use of the dominant estate, or enterprise benefitted by the easement, brings no change in the physical use of the easement, the dominant owner may continue to use the easement.

Restatement § 4.10 cmt. f.

Nevertheless, Defendants argue that because the easement is a private right of way Plaintiff cannot invite members of the public to use the easement to visit the 423 acres.  Defendants contend that by inviting members of the public to use the road Plaintiff is converting a private easement into a public right of way, which constitutes both an unreasonable burden on Defendants' property and an unconstitutional taking of Defendants' property.

While it is true that the easement rests on private land, Defendants' argument fails to appreciate the full extent of Plaintiff's rights over that private land. The Acklesons allowed the Cox Trust to reserve an appurtenant easement over the 10 acres.  *Brooks*, 101 N.M. at 206, 680 P.2d at 346.  "An appurtenant easement runs with the land to which it is appurtenant, and passes with the land to a subsequent grantee with passage of the title of the dominant estate." *Kikta v.*

13

*Hughes*, 108 N.M. 61, 63, 766 P.2d 321, 323 (Ct. App. 1988).  By law, the rights that the Cox

Trust retained in the easement passed to Plaintiff when Plaintiff purchased the 423 acres.

Although an easement is not a fee ownership interest, it "constitutes a liberty, privilege,

right, or advantage which one has in the land of another."  *Kennedy*, 80 N.M. at 736, 460 P.2d at

811.  Defendants do not dispute that the Cox Estate, as a private landowner, retained the right to

invite guests to their property by way of the road across Defendants' land.  Defendants even

concede that the parties intended "that the road and utility easement would be used by the owners

of the 423 acre tract, their guests and invitees . . . ."  Defs.' March 18, 2003 Letter Br. at 5.  Yet

Defendants claim that if Plaintiff is allowed to invite some members of the public to use the road

across their property, their private right of way would be converted into a public one.

New Mexico law does not support Defendants' argument.  New Mexico courts have

reviewed instances where businesses on private rights of way have openly solicited public

visitation, and these decisions always have held that public patronage of a business is insufficient

to convert a private road into a public one.  *Luevano v. Maestas*, 117 N.M. 580, 585, 874 P.2d

788, 793 (Ct. App. 1994) (observing that the business advertised in the Yellow Pages and its

customers "used the road to reach the business"); *Hervbertson v. Iliff*, 108 N.M. 552, 555, 775

P.2d 754, 757 (Ct. App. 1989) (holding that use of a road on private property by business invitees

did not establish a public road).  The rationale behind these rulings is simple:  an invitee's use of

an easement is, in legal effect, use by the invitor-landowner.  *Luevano*, 117 N.M. at 585, 874 P.2d

at 793.  Thus, from a legal standpoint, when the BLM invites members of the public to use its

easement appurtenant it is not the public but rather the BLM that is using the road.

14

The fact that the road dead ends on Plaintiff's property is not without legal significance. State law has noted that the use "by the public of [a] private dead end road will not, alone, transform it into a public street." *Luevano*, 117 N.M. at 585, 874 P.2d at 793 (citing *American Nassau Bldg. Systems, Ltd. v. Press*, 143 A.D.2d 789, 790-791, 533 N.Y.S.2d 316, 318 - 319 (N.Y. App. Div. 1988)). From a practical standpoint it means that the members of the public who drive past Defendants' property are headed to a specific place, a recreational area, and with a particular purpose in mind, to enjoy the natural setting.[5] The easement is not a thoroughfare in the sense that a visitor can use the road to reach any other destination.

Defendants argue that *Camino Sin Pasada* requires a different result. *Camino Sin Pasada* held that the "owners of the dominant estate and their guests, not the general public" could use a private easement. 119 N.M. at 216, 889 P.2d at 251. However, *Camino Sin Pasada* did not specifically address what a sovereign landowner's rights are when it purchases land with an appurtenant easement. Although neither party has cited any authority that discusses this particular aspect of this case, the Court's research shows that a sovereign entity does not lose the rights that would belong to a private landholder under the same circumstances. *Town of Sandown v. Kelley*, 97 N.H. 418, 89 A.2d 758 (1952) (permitting the public to use a private right of way acquired by the town to reach the town's dump); *cf. Cal-Neva Land & Timber Inc.* v. *U.S.*, 70 F. Supp. 2d 1151, 1159 (D. Or. 1999) (holding that the BLM could allow recreationalists to use an easement over private property); *Inter Community Memorial Hospital Building Fund, Inc. v. Brown*, 168

---

[5] Since Plaintiff's invitees—outdoor recreationalists—can be identified and segregated from the public at large, their use of the road will not alter the private character of the road. *Luevano*, 117 N.M. at 585, 874 P.2d at 793 (quoting 4 Herbert T. Tiffany, The Law of Real Property § 1212 at 1055 (3d ed. 1975), for the proposition that "use[] by the public does not mean use[] by certain members of the public," ); *Trigg*, 95 N.M. at 134, 619 P.2d at 579.

N.Y.S.2d 535 (N.Y. Trial Term 1957) (holding that private hospital owners could use a private right of way for "all purposes connected with the maintenance and operation of its hospital" without creating a public thoroughfare).  None of these decisions is inconsistent with New Mexico law.

The 60-foot-wide road and utility easement is private property in the sense that Defendants are the fee owners of land underlying it.  But, Defendants never purchased the entire bundle of rights that customarily comes with fee ownership.  The Cox Trust reserved an unrestricted right to use the 60-foot-wide easement to reach its land when it conveyed the 10 acres to the Acklesons.  That right passed with the title of the dominant estate to Plaintiff.  As Defendants never purchased the right to exclude the dominant estate's invitees from the easement, they cannot now complain because Plaintiff has chosen to invite members of the public to use it.  Plaintiff can invite others, including members of the general public, to drive their vehicles across the private right of way on Defendants' land so long as Plaintiff reasonably exercises that right.  *Camino Sin Pasada*, 119 N.M. at 216, 889 P.2d at 251 (holding that a landowner "is limited to reasonable use" of an easement).

The Court concludes that Plaintiff has shown a substantial likelihood of success on the merits of its case under the heightened standard of *Salt Lake Tribune Pub. Co.*, 320 F.3d at 1099. Plaintiff may invite members of the public to drive their vehicles across the easement because Plaintiff's use under its proposed management plan will neither burden Defendants' servient estate to the point where Defendants' consent is required, nor result in a taking of Defendants' property.[6]

---

[6] Having decided that Plaintiff will prevail on its appurtenant easement claim, the Court need not discuss Plaintiff's rights under the UIA.

    2.     *Plaintiff is Enduring an Irreparable Injury*

The second factor for a preliminary injunction requires Plaintiff to demonstrate that it will

suffer irreparable injury if the preliminary injunction is denied.  Plaintiff argues that it has suffered

an "irreparable loss each and every time a person's free passage to the Soledad Canyon public land

is denied."  Doc. No. 11 at 6.  Indeed, for over a year Defendants have prevented Plaintiff's

invitees from driving any vehicle over the only road access to Plaintiff's land.  Pl.'s Ex. 8.

Plaintiff's loss of access for its invitees cannot be compensated by an award of money damages.

*Kikumura v. Hurley,* 242 F.3d 950, 963 (10th. Cir. 2001) (defining irreparable injury as "when the

court would be unable to grant an effective monetary remedy after a full trial because such

damages would be inadequate or difficult to ascertain").  Since Plaintiff has the lawful right to

invite a reasonable number of members of the public to drive vehicles across the easement on

Defendants' property, Plaintiff has made a sufficient showing of irreparable injury.

    3.     *Plaintiff's Injury Outweighs Any Injury to Defendant*

During the hearings in this case Defendants testified about the nighttime trespass that has

already occurred on their property and the attendant safety concerns and litter problems.  Although

Defendants claim that these problems will increase if the road is opened to Plaintiff's invitees,

Defendants readily admit that this contention is speculation.  Tr. at 106 (March 10, 2003).

Defendants' concerns are serious, but they do not appear to be associated with Plaintiff's invitees.

Plaintiff's invitees will be allowed to use Plaintiff's property only during the daylight hours and

Plaintiff will construct a gate on its property to control access.  Importantly, Plaintiff's invitees will

be limited in number.  The BLM has represented that if public access is allowed it will perform

"law enforcement patrols of the area, and that [the BLM] would have on site people during busy

weekends to monitor and limit disturbance."  Tr. at 39 (Jan. 14, 2003).  The BLM and the Doña

Ana County Sheriff's Department will meet law enforcement needs in the area should trespass or

litter problems occur.  March 18, 2003 Letter Br., Attachment A.

        One of Defendants' concerns is that visitors to the BLM property currently park cars on the

side of the road next to Defendants' property.  However, the locked gate constructed by

Defendants is the root cause of that problem.  Plaintiff plans to build a parking site located on

Plaintiff's property and out of Defendants' view so that public parking will not physically obstruct

Defendants' property or visually distract from Defendants' enjoyment of their land.  Tr. at 39 (Jan.

14, 2003).  Plaintiff also will place its gate well within its property boundary so that vehicles can

turn around when the gate is closed without interfering with Defendants' property.

        Finally, Defendants claim that they will be injured by having to share the road with

members of the public.  But this is not a cognizable injury as both increased traffic and traffic from

the dominant estate owner's invitees were always contemplated by the parties.  The increased

vehicular use of the road resulting from Plaintiff's limited number of invitees will be minor when

compared to what Defendants would have experienced if the 423 acres had been sold to a

developer that subdivided the property.

        The Fowler Appraisal, which is the most objective assessment of how many home sites the

423 acres would support, estimated that 18 to 24 homes could be developed on Plaintiff's

property.  Defs.' Ex. R at 32.  An extremely conservative estimate of the traffic flow across the

easement if a residential subdivision had been constructed would be 36 round trips per day (two

round trips per home per day for 18 homes built).  Notably, that number does not include the trips

made by construction crews that would have to build the homes over the nine years it would take

18

to sell the lots, *Id*. at 33, or the other service providers, guests, or invitees that would frequent the homes.  Plaintiff's proposed management plan anticipates that Plaintiff's invitees will use the easement to visit the 423 acres at an average rate of 25 vehicles per day.  Even after adding to Plaintiff's proposed use the trips made by the BLM's gatekeepers and patrols by law enforcement, Plaintiff's use will be much lower than a residential subdivision would have brought.  This comparison suggests that Plaintiff's use of the easement under the proposed management plan is not only reasonable, but it will actually reduce the traffic that Defendants would have had to endure if the 423 acres had been developed as home sites.[7]  On this record the Court concludes that Plaintiff's inability to use the easement as articulated in Plaintiff's proposed management plan outweighs any injury to Defendants.

> ### 4.        *A Preliminary Injunction is Not Adverse to the Public Interest*

The public interest will be benefitted by granting the preliminary injunction.  Recognizing Plaintiff's right to use its easement for a limited number of invitees ensures that members of the public will have the opportunity to visit and enjoy this public land.  The privilege of vehicular access will be especially important to those, like the elderly and the physically challenged, who may not be able to hike to the land from the Dripping Springs Natural Area where public parking is presently available.  Since Plaintiff's use of the easement under the proposed management plan conforms with Defendants' private property rights under the law of servitudes, Defendants' claim that a preliminary injunction will diminish the rights of owners of private property is meritless.

---

[7]  Plaintiff's proposed management plan is attached to this Memorandum Opinion and Order.

**PRELIMINARY INJUNCTIVE RELIEF**

Plaintiff has requested the removal of Defendants' locked gate, which is blocking the easement.[8]  Defendants contend that their locked gate is entirely consistent with the history of the road since the Cox Trust had a locked gate across the road when the Acklesons purchased their property.  The question of whether the gate should be removed is a question of fact reserved for the trial court.  *Huff v. McClannahan*, 89 N.M. 762, 765, 557 P.2d 1111, 1114 (Ct. App. 1976).

While the Cox Trust did maintain a locked gate across the road for a few years after it sold the Acklesons their property, that gate was for the sole benefit of the Cox Trust and the dominant estate that existed after the sale of the 10 acres to the Acklesons.  Although the Cox Trust's gate may have provided some secondary benefits to the Acklesons and the Jeters, the Cox Trust alone controlled the operation of the gate.  During the sale to the Acklesons, the Cox Trust gave the Acklesons succinct and strict instructions to "keep the gate locked at all times."  Tr. at 35 (March 10, 2003).  The Cox Trust needed to control who could enter the remaining 423 in order to protect its valuable real estate.

The evidence shows that the Cox Trust did not anticipate that Defendants would be able to impede the easement in any fashion.  On one occasion just after the Acklesons moved onto their property they built a fence within the boundary of the 60-foot easement.  Tr. at 104-06 (Jan. 14, 2003).  The fence ran parallel to the road, without blocking it.  The Cox Trust pointed out that the fence encroached on the easement and asked the Acklesons to remove it.  The Acklesons did.

---

[8]  Defendants concede that they constructed the gate to prevent Plaintiff's invitees from using the easement.  Tr. at 127-28 (March 10, 2003).  That was the only conceivable purpose for the gate since the Acklesons and the Jeters already had installed gates where their private driveways leave the easement.  Doc. No. 20, Ex. J. at ¶ l; Tr. at 108 (March 10, 2003).

However, when the Acklesons reconstructed the fence a second time it was still within the 60-foot easement. Once again, the Cox Trust asked the Acklesons to move the fence because it obstructed their reserved easement. The Acklesons did so to respect the easement boundary.[9]

On this record the Court concludes that the right to control access to the dominant estate passed to the owners of the dominant estate, and not to Defendants. Accordingly, the Defendants' gate presents an unreasonable obstruction of Plaintiff's easement. Until this matter is finally resolved Defendants must open the locked gate across the dirt extension of Soledad Canyon Road and keep the gate open so that Plaintiff and Plaintiff's invitees can enter Plaintiff's property.

IT IS THEREFORE ORDERED that:

(1)     Plaintiff's Motion for Preliminary Injunction (Doc. No. 10) is GRANTED;

(2)     Defendants will be preliminarily enjoined from obstructing Plaintiff's easement by any means; and

---

[9] Defendants' argument that their gate simply mimics the conditions that existed when the Acklesons purchased their 10-acre lot fails to account for the plans that the Cox Trust had to develop the property. Although Plaintiff did not raise the issue, the covenants that the Cox Trust included as part of the Acklesons' deed show that the Cox Trust did not anticipate that Defendants would control access to the 423 acres with a gate. Pl.'s Ex. 1 at 357. The purpose of these covenants were to "prevent nuisance," and "to secure each site owner of the full benefit and enjoyment of his/her property, with no greater restriction on free and undisturbed use of his/her site than is necessary to insure the same advantages to the other site owners." *Id.* Given the purpose of the covenants it is inconceivable Defendants or any potential homeowner on the 423 acres would be permitted to construct a gate to control who used the road.

The covenants also have specific provisions that address improvements, modifications, other changes, or "fences or fencing type barrier of any kind." *Id.* at 359, 361. Before anything can be constructed "placed, erected, allowed, or maintained upon any lot [] the same shall have been approved as to design and aesthetics by the Architectural Review Committee." *Id.* at 361. The Architectural Review Committee has two members: Sara Cox Hopkins and Vicki Perez. Although Sara Cox Hopkins testified against Defendants in this case, neither party asked her whether the Architectural Review Committee had approved of Defendants' locked gate across the easement.

21

(3)     Plaintiff's Motion in Limine to Prohibit Defendants' Expert Proffering a Legal

Opinion on a Matter of Law Reserved to the Court (Doc. No. 51) is DENIED.


CHIEF UNITED STATES DISTRICT JUDGE